E-FILED
Thursday, 12 September, 2013  11:21:47 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

| | | |
|---|---|---|
| HEIDI SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-cv-3073 |
| | ) | |
| ILLINOIS DEPARTMENT OF REVENUE, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Defendant's Motion for Summary Judgment is allowed.

The Illinois Department of Revenue is granted summary judgment.

Here are the reasons.

### I.

Plaintiff Heidi Scott was hired in January 1999 as a staff attorney in the Income Tax Division of the Illinois Department of Revenue in Springfield, Illinois.

In the fall of 1999, Scott purchased a home in Springfield.  In August 2001, she married Mark L. Vincent, an attorney who had a home and a law practice in Rushville, Illinois.[1]

---

[1] Rushville is located a little over 55 miles northwest of Springfield.  The communities are connected by rural state highways.

1

In May of 2003, Scott gave birth to her first child, a son.  Scott took maternity leave.  At the Department, Family and Medical Leave Act (FMLA) leave runs concurrently with maternity leave.

Scott requested that she be allowed to work from home part-time while on maternity leave.  Her request was approved by Jackson Donley (Senior Counsel, Income Tax), Paul Caselton (Deputy General Counsel, Income Tax), and Paul Boganski (Acting General Counsel,[2] Department of Revenue).  Effective June 2003, Scott worked 50% of her full-time schedule for half of her salary.

On January 29, 2004, while on maternity leave, Scott submitted a memorandum to Lynne Raimondo, General Counsel.  In the memorandum, Scott requested (1) that Raimondo extend the authorization to work part-time from home through June 15, 2004, and (2) that Raimondo authorize Scott, upon the conclusion of maternity leave, to work full-time from home.

Regarding working full-time from home, it is apparent from the face of the document that the request was to be able to work exclusively from home, and to come to the Department's legal offices only for meetings or to pick up or drop off assignments.  In other words, the request did not involve a split schedule involving some days at the office and some days at home.

Scott stated the following in the memorandum:

---

[2]  During the early portion of the relevant time period, the chief legal officer of the Department was called the Chief Counsel, while during the later time period (and up to the present) the title is General Counsel.  The term General Counsel is used throughout this Opinion for consistency.

My request for an extension of part-time work from home through the middle of June and an eventual expansion to full-time thereafter is because, with the birth of my son, family has become more of a priority. My husband, Mark, is a self-employed attorney in private practice. His practice is in Rushville, Illinois, and he generally works between 60 and 70 hours a week. In rush hour traffic the travel time between Rushville and Springfield is 1½ hours, or 3 hours round trip. Because my husband's practice is well established in Rushville and these last six months have proven that I can maintain the same quality work while completing my assignments in a timely fashion from home, it would be more practical for us to have our home in or near Rushville. *Approval of my request would allow me to avoid the long hours of travel time between Rushville and Springfield.*
. . .

Should my request be approved, I am confident that the quality and quantity of my work would remain at or above the level established while working from the office. *I would also continue to come to the office as required for meetings to pick up/drop off assignments.* Thank you for your consideration to my request.

Exhibit [d/e 52], p. 3-4 (emphasis added).

Raimondo extended Scott's proposed extension to continue working from home while on maternity leave. However, there is no information on file suggesting that Raimondo granted Scott's request to work exclusively from home, and it appears that this request was implicitly denied.

About four months later, on May 25, 2004, Paul Caselton (Deputy General Counsel/Income Tax) sent the following email to Scott:

Heidi,

I asked Lynne if it would be ok for you to work from home 3 days a week and in the office 2 days, but she held tough and insisted that you be in the office 3 days a week and work from home 2. We decided that we should try having a flexible schedule, rather than saying you must be here Tuesday, Wednesday or whatever. If this flexible schedule doesn't work, we'll try something else.

3

She also suggested that we get you one of the new laptops with wireless access that the auditors are getting, to make it easier for you to work from home those 2 days a week.
I didn't mention office space.

So when do you want to start working full time again?  We will have lots of regulation drafting and forms amendments to do if all our legislation passes.

Paul

Exhibit [d/e 52], p. 5.

There is no further documentation regarding this partial work-from-home arrangement, and there is nothing in writing in the record from General Counsel Lynne Raimondo.[3]

Scott, who was now expecting a second child, concluded her maternity leave and returned to working full-time on June 16, 2004—working three days in the office and two days from home.

A little over six months later, in December 2004, Scott delivered her second child, another son.  She went on maternity leave again.  Before delivering the baby, she had requested permission to work 50% from home while on maternity leave.

This request was denied by Acting General Counsel Louise Calvert on January 31, 2005.  Exhibit [d/e 48-3], p. 64.  Scott requested reconsideration, and Calvert denied the request, stating "I've thought more about your request to work

_____

[3]  Department Director Brian Hamer was not informed of the authorization, and did not approve it.  Exhibit [d/e 48-3], p. 53.  When Hamer did learn of it much later, he was surprised it had been authorized.  *Id.* at 54.

4

from home.  Unfortunately, I still do not think it is in the best interests of the Legal

Services Division to have attorneys working from home."  Exhibit [d/e 48-3], p.

65.

On February 7, 2005, Scott asked the Director of the Department, Brian

Hamer, to overturn Calvert's decision:

> Director Hamer:
>
> As a result of an untimely decision with no specific grounds for
> denial, I am seeking your approval to my request to work part-time from
> home during the Family Leave period following the birth of my second
> child. . . . I had no reason to believe that my request would be denied based
> on prior Department practices and my own past performance while working
> from home.  You may recall that you approved my same request on April
> 16, 2003, and it proved to be an excellent arrangement for the Department
> and myself. . . .
>
> . . . There was no reason given for the denial . . . . Since we have
> never met, Ms. Calvert does not know me, the quality of my work or my
> work ethic.  My work supervisor in Springfield is in the best position to
> make an informed decision as to whether my request should be approved
> based upon the nature of my work assignments and past performance. . . .

Exhibit [48-4], p. 44.

Hamer requested clarification, and Scott responded that she had learned that

a new General Counsel would be starting soon, and proposed renewing her request

with the new General Counsel.

On March 1, 2005, Mark Hellner became General Counsel.  Hellner was

generally opposed to alternative work arrangements, including working from home

and working compressed workweeks.[4]  Hellner had stated that if he had the authority, he would have rescinded all formal flextime schedules that were in place for legal staff in Chicago.  Hellner had told division chiefs that all requests for alternative work arrangements had to be authorized by him, even though the form used by the Department did not require his signature.  Hellner had a background in litigation (as well as tax) and believed that attorneys should physically be in the office during regular business hours.

Scott requested permission from Hellner to work from home 50% while on maternity leave.  Hellner allowed Scott to work part-time (50%) from home while on maternity leave for a 90-day period, with the possibility of extending it for additional 30-day periods.

The agreement was memorialized in a document signed by Hellner (on March 17, 2005) and Scott (on March 21, 2005), which stated that the agreement did not constitute a policy or entitlement which would form the basis for any future requests by Scott.  *See* Exhibit [48-4], p. 38.  Hellner ended up approving extensions of the 50% work-from-home arrangement through March 14, 2006.

On October 21, 2005, Scott and her husband entered into a contract to sell their home in Springfield.  The closing was in December 2005, and Scott and her family moved to Rushville.

---

[4]  A compressed workweek could mean working 40 hours over four workdays and taking every Friday off, or working 80 hours over nine workdays and taking every other Friday off.

Scott was scheduled to return to full-time employment on March 15, 2006.

On March 15, 2006, Scott returned to working full-time, and was observing her previous practice of working from home two days per week.

On March 17, 2006, Hellner learned of Scott's schedule, and informed Caselton that Scott was not approved to work from home two days per week.

No other attorney or legal services employee in the Department was authorized to work from home as part of a regular schedule while working full-time.

In the Department, field employees who work in collections, audit, and tax enforcement do not work in state offices.  Instead, they operate out of their homes.  But field employees actually conduct the bulk of their job duties in the field—for example, auditors visit the businesses they are assigned to audit.  In addition, some senior staff members, on rare occasions, work from home.  Finally, some Department employees are allowed to work from home due to a medical condition of short duration (e.g., if a physician ordered bed rest during pregnancy).

Shortly after Scott was told she could no longer work from home, she brought several boxes of work-related materials from her Rushville home to her office in Springfield.  She parked her car in Hellner's parking space.  (Hellner worked primarily out of the Department's Chicago office.)

Hellner wrote the following email to Scott on March 20, 2006:

7

Several people have mentioned that you have been parking in my parking spot.  As we have never discussed this, I think it is inappropriate.  Moreover, some other personnel have now . . . asked why you have this opportunity and they don't.  I didn't want to tell them that you self-selected, but it was embarrassing.  Sorry, but you must discontinue this practice.  Thanks.

Exhibit [d/e 49-7], p. 52; Exhibit [d/e 57], p. 40.

Scott responded as follows:

I parked there ONCE for perhaps two hours because I had boxes of material to carry in (mostly legislative material).  I am shocked at these accusations . . . may I ask who these people are that claim I've been "parking" in your spot?  Obviously someone around here doesn't like me to make up such complete and utter lies.  Furthermore, I didn't even know about your spot until I mentioned how much I had to carry in and it was [another employee] that told me she had parked in your spot for similar reasons.

Exhibit [d/e 48-7], p. 53; Exhibit [57], p. 40 (ellipsis in original).

Scott then added "Perhaps security video tapes will prove this," and Hellner responded "ok; I'm fine with what you did" and "It's already gone too far."

Exhibit [d/e 57], p. 40.

Scott claims that other legal services employees used Hellner's parking space without consequence.

Throughout the years following Scott's second FMLA leave, she submitted numerous forms requesting (1) to return to working two days a week at home, or (2) to be given a compressed schedule.

As noted above, Hellner had indicated that his authorization was required for an employee to be placed on an alternative schedule.

8

Caselton and Donley authorized Scott's request for an alternative schedule, involving a four-day workweek.  When Hellner learned that this had been done without his approval, he sent an email expressing his frustration, and reprimanding Caselton.  Hellner denied Scott's request for a four-day workweek.

Scott made multiple requests over the years to either return to her arrangement of working two days a week from home, or having an alternative work schedule involving a compressed workweek.  Scott's requests were routinely denied.

During the course of these events, the legal positions in the Department became union positions.  While this change affects some of the minor details of this case, it does not have a significant impact on the core issues.

In 2006, Scott was involved with the Government Bar Association.  The Illinois Executive Inspector General investigated her for some of her actions at work on behalf of the Government Bar Association, including posting a flyer.  The investigation revealed that Scott used State resources (phone and computer) and State time to promote a non-State event that featured candidates for a county-wide partisan election.  The flyer posted at the Department highlighted the fact that this would be the candidates' first public appearance together, and the event reportedly devolved into something akin to a political debate.

Scott alleges that Department leaders caused her to be investigated. Following an in camera review, it was determined that Department leaders had not initiated the complaint. Whoever had initiated the complaint against Scott was justified in complaining about her actions, the investigation corroborated the allegation, and it appears that Scott misused State time and resources.

Eventually Hellner was asked to resign as General Counsel. After Hellner left the Department, Scott once again began parking in the parking space reserved for the General Counsel. The Director's office learned of this practice, and Scott was directed to stop parking in the General Counsel's parking space.

In response, Scott sent an email to an individual in the Director's office, complaining that she was being targeted and arguing that she should be allowed to park in the General Counsel's parking space. Eventually, a new General Counsel, John McCaffrey, was appointed.

Regarding Scott's work evaluations, her direct supervisors have consistently given her high marks. However, as Scott got into repeated confrontations with management regarding her schedule, senior management began scoring her lower.

In June 2007, Scott's third child was born. Scott took FMLA leave from June 2007 to June 2008. Scott was denied the opportunity to work part-time from home, and took an entire year off from work. Scott's third child experienced a number of developmental delays that required extra appointments with specialists.

Scott requested that she be allowed to work from home two days per week, but this request was denied. Scott repeatedly requested permission that she be allowed to work a compressed work schedule. Her request was eventually granted, and she began to work a four-day workweek, arriving at the office at 6:00 a.m. During an initial period, Scott was required to send an e-mail upon arriving, to have an electronic record of when she arrived at work, because she was usually the only attorney present when she arrived. Once General Counsel McCaffrey was satisfied she was complying with the rules of the compressed workweek she was allowed to sign in and out manually without sending any e-mail.

Problems eventually arose with the four-day schedule. Scott began routinely arriving before her 6:00 a.m. start time, and began to get into numerous arguments with timekeepers (usually clerical or secretarial staff in the Department). During the pendency of this case, Scott began clandestinely photocopying the sign-in sheet, apparently as some kind of covert discovery regime. Scott was directed to cease this activity, and eventually the timesheets were kept under lock and key to avoid improper photocopying. This practice, which has now ceased, caused problems when Scott would have to leave work early on certain days, because she was unable to locate the timesheet. As a result of these issues, Scott's relationship with timekeepers became increasingly acrimonious.

Scott has complained that she was denied access to certain databases, information about free continuing legal education opportunities, and a proprietary legislative newsletter known as Capital Fax.  The record reflects that (1) her coworkers were also left in the dark about some of these opportunities, (2) that she did, in fact, have access to these resources, or (3) in at least one case, she was left off of an email list because she was not working during maternity leave.

Scott has alleged that was retaliated against when one of her chief supporters, Jackson Donley, did not have his contract with the Department renewed.  There is nothing in the record, other than Scott's speculation, to suggest that Jackson's separation with the Department was connected to Scott.

One of more bizarre claims made by Scott involves the office of a colleague, Attorney Martha Mote.  At the time the briefing was written, Mote was residing at a hospice facility and was dying of a terminal illness.  The office has a window facing the Illinois Capitol.  Scott claimed that it was her turn to occupy an office with a window, and that she should be able to occupy Mote's office while Mote was in hospice care.  Scott argues that the Department's denial of the use of this office is another sign of retaliation, because a different attorney had made temporary use of Mote's office on an earlier occasion.

The Parties do not dispute that the Department is an employer as that term is defined by the Family and Medical Leave Act.

II.

Scott initiated this action on March 17, 2008.  *See* Complaint [d/e 1].

On October 27, 2009, the Department moved to dismiss the action based on Scott's failure to appear at her deposition scheduled for October 23, 2009.  *See* Motion to Dismiss [d/e 11].  Judge Jeanne E. Scott denied the motion, but directed counsel for Scott to submit three dates on which Scott could be present for her deposition.  *See* Text Order of Nov. 5, 2009.  Judge Scott said that the Department could renew its request for dismissal if Scott's attorney failed to cooperate regarding the dates, or if Scott failed to appear at the deposition.  *See id.*

The parties agreed on a December 2009 date, but Scott's attorney was unable to attend, so the deposition was rescheduled for January 6, 2010.  *See* Defendant's Renewed Motion to Dismiss [d/e 13].  On January 6, 2010, Scott's attorney informed the Department's attorneys that Scott would not be appearing at the deposition.  See id.  Scott's attorney did not provide a new deposition date, despite numerous promises to do so.  *See id.*  Eventually, the Department renewed its motion to dismiss the case.  *See id.*

Neither Scott nor her attorney filed a timely response to the Renewed Motion to Dismiss, and Judge Scott dismissed the action with prejudice.  *See* Text Order of Feb. 12, 2010.  Judgment was entered for the Department.  *See* Judgment [d/e 15].

13

A month later, Scott filed a Motion for Reconsideration [d/e 17], arguing that dismissal was an overly-harsh sanction, and explaining that Scott's non-appearance was the result of mistakes made by Scott's law firm, not Scott. The Department filed a Response [d/e 18], arguing that dismissal was an appropriate sanction. A telephonic hearing was held, and Judge Scott vacated the Judgment and directed Scott's attorney to pay $1,500.00 for the time opposing counsel spent fruitlessly trying to arrange Scott's deposition. See Minute Entry of March 30, 2010.

Eventually, Scott's deposition was taken and, after numerous extensions, discovery was concluded.

Upon Judge Scott's retirement, the case was transferred to then-Chief Judge Michael P. McCuskey.

The Department filed its Motion for Summary Judgment [d/e 48] on March 18, 2011, Scott filed her Memorandum in Opposition [d/e 51], and the Department's Reply [d/e 61] was filed on May 5, 2011. The parties were authorized to file papers in excess of the page limitations, and the memoranda of law and exhibits are voluminous. Judge McCuskey transferred the case to the undersigned, after it became apparent that Judge Myerscough had a conflict.

III.

"Summary judgment is appropriate when the evidence submitted, viewed in the light most favorable to the non-moving party, shows 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (quoting Fed. R. Civ. P. 56(c) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

In order to survive summary judgment, there must be sufficient evidence that a reasonable factfinder could return a verdict for the nonmoving party. *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009).

"[A] motion for summary judgment requires the responding party to come forward with the evidence that it has—it is the 'put up or shut up' moment in a lawsuit." *Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009) (quotation marks omitted). Although inferences are drawn in favor of the nonmoving party, inferences relying on speculation or conjecture are insufficient. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).

IV.

The Court notes at the outset that this case is not as factually complicated as the parties suggest. The parties, in particular Scott, have attempted to make it appear as if the parties dispute many of the key facts.

15

However, many of the issues in this case involve interpreting the plain language of written documents.  This employment case involves the work schedule of an attorney working for the State of Illinois.  Much of the evidence consists of emails, documents, and statements between the relevant players.  The content or accuracy of these documents is largely undisputed.  Rather, the parties dispute how they should be interpreted.

V.

The Court will first look at Scott's FMLA interference claim (which was raised for the first time in the response to the motion for summary judgment).

A.

The Court of Appeals has said the following regarding FMLA interference claims:

> The FMLA entitles employees who have returned from a family or medical leave to be reinstated to the position they held before leave, or to an equivalent one.  An equivalent position is one that is virtually identical to the former position in terms of pay, benefits, and working conditions.  It must involve the same or substantially equivalent skill, effort, responsibility, and authority.  This equivalency requirement does not extend to de minimus or intangible, unmeasurable aspects of the job.

> There are limitations on an employer's obligation to reinstate an employee.  An employee is entitled only to benefits that she would have retained if she had not taken a leave.  At all times, the employee bears the burden of demonstrating her right to be restored to the same or equivalent position.

*Mitchell v. Dutchmen Mfg. Inc.*, 389 F.3d 746, 748 (7th Cir. 2004) (citations omitted).

16

The Seventh Circuit elaborated in a subsequent case:

The plaintiff carries the burden of establishing an FMLA claim.  To establish such a claim, an employee must show that: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. . . .

An employee's right to reinstatement is not absolute.  The FMLA allows an employer to refuse to restore an employee to the former position when restoration would confer a right, benefit, or position of employment that the employee would not have been entitled to if the employee had never left the workplace.

*Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 933 (7th Cir. 2010) (citations and quotation marks omitted).

A regulation interpreting the FMLA states the following: "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."  29 C.F.R. § 825.216.

B.

1.

At issue is an authorization to work two days a week from home that was agreed to orally by the Department's previous General Counsel.  Scott did not request this schedule in writing.  The decision was not memorialized in any fashion, other than an email to Scott from her supervisor.  The Director of the

Department was not consulted, and, upon finding out about the arrangement, he was surprised that it had been authorized.

Scott worked from home two days a week for a short period of time that lasted just over six months. During this period of time she lived in Springfield.

No other legal services employee in the Department was authorized to work from home as part of a permanent schedule.

During her maternity/FMLA leave, she moved nearly 60 miles away from her office. Upon returning from maternity/FMLA leave, the new General Counsel rescinded the arrangement.

Scott claims that, but for taking FMLA leave, she would have been able to continue working from home two days a week indefinitely.

The Court disagrees. Viewing the facts in the light most favorable to Scott, the Court concludes that even if she had not taken any additional leave or had any additional children, her two-day-a-week work-from-home arrangement would have been terminated, due to the repeated, contemporaneous statements made by relevant policy-makers that they opposed permanent work-from-home schedules, particularly for lawyers.

## 2.

Scott argues that her arrangement constituted "flextime," and that as a result it could only be revoked for good cause, under the employee handbook.

18

Much of the debate and discussion of "flextime" is mere semantics.  The term "flextime" is used both as a general term to describe alternative work schedules and a term of art to describe specific kinds of work schedules used by certain employees of the State of Illinois.  When used as a term of art, certain protections come into play under rules, regulations, and caselaw.

Ultimately, the Court concludes that Scott's work-from-home schedule is not "flextime" for the purposes of the Department's employment handbook or *Washington v. Ill. Dep't of Rev.*, 420 F.3d 658 (7th Cir. 2005).  These authorities are distinguishable.

The Court takes special note of the bureaucratic process involved in getting "flextime" approved.  Forms have to be filled out, and procedures must be followed.  Once the "flextime" schedule is established, it can only be undone by following specific protocols.

Here, Scott was granted a perquisite—authorization to work from her home two days a week—which was afforded by way of a conversation between the General Counsel and a Deputy General Counsel.  That perquisite was rescinded by way of communication by a successor General Counsel.

Ultimately, Scott believes that she is entitled to this perquisite in perpetuity, and cannot accept the fact that permission granted by an officeholder can be rescinded by a successor officeholder.

19

When Scott invoked her work-from-home schedule in March 2006, there was no document to reference in her personnel file that had been signed by a former General Counsel.[5]

Instead, she had to scramble to find the only relevant documents: (1) a memorandum requesting permission to work from home every day of the week, visiting the office only for an occasional meeting or to pick up or drop off materials, and (2) an email months later stating that she could work from home two days a week.  Viewing the facts in the light most favorable to Scott, these documents do not establish a benefit or condition of employment that would be protected and preserved while taking FMLA leave.

### 3.

Any implied claim of reliance by Scott regarding moving to Rushville is without merit.  Scott has tried to put words in the mouth of General Counsel Lynne Raimondo regarding the rationale for allowing her to work two days a week from home.  Specifically, Scott has cited Scott's January 29, 2004 memorandum as listing the rationale for Raimondo's May 25, 2004 decision.  *See* Memorandum in Opposition to Motion for Summary Judgment [d/e 51], p. 57.  Scott alleges that Raimondo authorized the work schedule "so Plaintiff could have her home near Rushville and avoid the long hours of travel."  *Id.*  As detailed above, all we have

---

[5]  Such a document would have quickly established her claim, and provided the scope, duration, and details of the grant of permission to work from home.  It would have also put Department policy-makers on notice that she had been afforded this privilege.

20

regarding Raimondo's decision is an email from Caselton.  No rationale was provided.

At all relevant times, Scott's duty station was her office at the Department of Revenue.  Even during the months she participated in the work-from-home arrangement, she still had to work a majority of the workweek (three days out of five) at her office at the Department of Revenue.

Verbal permission to work two days from home per week would probably not provide adequate reason for a rational person to sell their home and relocate, unless they were planning on doing so anyway.

The Court notes that, according to Scott, <u>during the entirety of the six months she was working from home two days per week, she was living in Springfield</u>.

VI.

Next the Court will examine Scott's retaliation claim.

A.

The Seventh Circuit has explained as follows:

The FMLA provides that it is unlawful for an employer to discharge or in any manner discriminate against any employee for opposing any practice the FMLA makes unlawful.  The difference between a retaliation and interference theory is that the first requires proof of discriminatory or retaliatory intent while an interference theory requires only proof that the employer denied the employee his or her entitlements under the Act.  To succeed on a retaliation claim, the plaintiff does not need to prove that retaliation was the only reason for the [employer's action]; she may

> establish an FMLA claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision.

*Goelzer*, 604 F.3d at 995 (citations, quotation marks, and alteration omitted).

> An employee may proceed under the direct or indirect methods of proof to establish a prima facie case of retaliation under the FMLA. . . .
>
> A plaintiff proceeding under the direct method of proof must produce direct or circumstantial evidence that the protected conduct was a substantial or motivating factor in the employer's decision. To establish a prima facie case of retaliation under the direct method of proof, the plaintiff must present evidence of (1) a statutory protected activity; (2) a materially adverse employment action taken by the employer; and (3) a causal connection between the two. Direct evidence typically consists of an admission by the decision-maker that he acted with retaliatory intent. Circumstantial evidence allows the finder of fact to infer that retaliatory animus motivated the decision-maker to take an adverse employment action against the employee. Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior toward and comments directed at other employees in the protected group.

*Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349-50 (7th Cir. 2009) (citations and quotation marks omitted).

> To proceed under the indirect method, [a plaintiff] must show that after taking FMLA leave (the protected activity) he was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a satisfactory manner. [If a plaintiff cannot identify a similarly situated person that was treated more favorably,] he must proceed under the direct method.

*Burnett v. LFW, Inc.*, 472 F.3d 471, 481-82 (7th Cir. 2006) (citations and quotation marks omitted).

> Under both the direct and indirect methods, the plaintiff must present evidence that a materially adverse action was taken by their employer. . . . For an employer's action to be defined as materially adverse it must be more disruptive than a mere inconvenience or an alteration of job responsibilities. For example, a materially adverse change might be

indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013).

B.

The Court concludes that, viewing the materials on file in the light most favorable to Scott, she has not suffered a materially adverse action.

Based on the documents on file, Scott remains employed by the Department, holds the same job title, has the same job duties, and has not suffered a pay decrease or a demotion. After some wrangling, Scott was allowed to work a compressed four-day schedule.

Therefore, her retaliation claim must fail under either the direct or indirect method. *James*, 707 F.3d at 782.

C.

Scott's primary argument regarding retaliation is a reformulation of her interference claim: that upon conclusion of her second FMLA leave she was no longer allowed to work from home two days per week.

Scott claims that the Department took this action to punish her for taking maternity leave. The record, viewed in the light most favorable to Scott, demonstrates that policy-makers in the Department at that time were opposed to attorneys working from home as part of a full-time schedule. The record further

shows that Scott was the only member of the Department's legal staff who had been granted this perquisite.

The Court concludes that the Department's decision was not a materially adverse action.

### D.

Regarding the numerous alleged separate acts of retaliation, most of the allegations described could be classified as "those petty slights and minor annoyances that often take place at work and that all employees experience." *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009).

The remainder of Scott's allegations are baseless.

### E.

In addition, throughout the relevant time period, Scott displayed an air of entitlement and acted in an insubordinate manner.  The Court reaches this conclusion even after viewing the record in the light most favorable to Scott.

Much of this is demonstrated through the numerous emails that are included as exhibits to the summary judgment documents.  Throughout her long-running conflict with the Department, Scott has openly mocked or commented derisively on the decisions made by Department leadership.  This occurred most often when she sought reconsideration from the original decision-maker, or review by the original decision-maker's superior.

Any argument that Scott's insubordination is somehow excused because some of it related to her FMLA claims is without merit. The FMLA does not allow employees to exercise their rights in a patently insubordinate way. *See Burnett*, 472 F.3d 471, 482-83 n.7.

The actions and attitude displayed by Scott could easily lead to conclusions that she has not met her employer's legitimate expectations,[6] that other employees are not similarly situated to her, and/or that her insubordinate attitude legitimately led to additional scrutiny.

Moreover, it appears from the entirety of the record, viewed in the light most favorable to Scott, that she has a tendency to engage in confrontational behavior.

Finally, it appears that a number of the allegedly retaliatory acts relate to the Department taking countermeasures in response to Scott's attempts to obtain information outside of the regular discovery process. For example, during the pendency of this case, Scott was photocopying sign-in information relating to other Department employees. Due to the pendency of this case she was blocked from conducting clandestine discovery. Also, Scott was removed from participating in a multi-agency council studying telework options for state employees. Scott had been conducting research on telecommuting by public employees, and Department

---

[6] It is apparent that Scott's substantive legal work was generally above average. However, employees who are insubordinate are not meeting the legitimate expectations of their employers. *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478 (7th Cir. 2010).

leaders suspected that these efforts were part of this litigation and her ongoing battles with the Department.

VII.

*Ergo*, the Motion for Summary Judgment [d/e 48] filed by Defendant Illinois Department of Revenue is ALLOWED.

Judgment is hereby entered in favor of Defendant Illinois Department of Revenue and against Plaintiff Heidi Scott.

The Clerk of Court is directed to prepare a written judgment.

CASE CLOSED.

IT IS SO ORDERED.

ENTER: September 10, 2013

FOR THE COURT:                         */s/ Richard Mills*
                                       _____
                                              Richard Mills
                                       United States District Judge